UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**Jessica Miller, et al.,**

            *Plaintiffs,*

                                          Case No. 1:05-cv-764

v.                                             Judge Thomas M. Rose

**The University of Cincinnati,**

            *Defendant.*

---

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DOC. 83, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DOC. 84, FINDING MOOT MOTION FOR LEAVE TO REOPEN DISCOVERY, DOC. 97, AND TERMINATING CASE**

---

Pending before the Court are motions by both parties for summary judgement. Both parties assert that, given undisputed facts in the case, the Court can determine whether Defendant, the University of Cincinnati, is in compliance with Title IX of the Education Amendments of 1972, 20 U.S.C.§§ 1681-87 and the Fourteenth Amendment to the United States Constitution. Because the University is in compliance with Title IX, Defendant's Motion for Summary Judgment, Doc. 83, will be granted and Plaintiffs' Motion for Summary Judgment, Doc. 84, will be denied.

**I.  Background**

This is a class action brought by Plaintiffs who are women athletes on the University of Cincinnati's intercollegiate women's rowing team. Plaintiffs allege that the University has violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-87 ("Title IX"). (Doc. 94). Additionally, Plaintiffs have brought a Fourteenth Amendment equal protection claim

pursuant to 42 U.S.C. § 1983. *Id.* Plaintiffs essentially allege that the University failed to provide the women's rowing team with a boathouse, minimal equipment, training facilities, coaching staff, and other necessary items for an intercollegiate rowing team. *Id.* Plaintiffs also allege that they were denied the equal opportunity to compete for and receive athletic scholarships. *Id.*

In addition, the women's rowing team's practice areas have not had restroom facilities, shower facilities, electricity, or protection for the boats; on occasion, the boats have been vandalized. Testimony of Jessica Miller [Plaintiff], Feb. 21, 2007, Preliminary Injunction Hearing at 143, 144 ("Miller Testimony"). Prior to the time that the University built and opened the Varsity Village the women's rowing team did not have its own space in which to practice non-water-related activities. *Id.* at 145. For example, at one time the rowing team had to practice on the racquetball court. *Id.* At other times, the team had to practice in the middle of the track team's practice, or the basketball team's practice, or whatever sports team might be in the same facility at the same time the women's rowing team was practicing. *Id.* In addition, the team had limited access to the weight room. *Id.* at 145-46. Until the Fall of 2006, the women's rowing team members had limited uniforms and team-related clothing available to them. *Id.* at 146. However, since the Fall of 2006, team members have had a full compliment of uniforms and team related clothing. *Id.* at 146-47.

About ten years ago, the University began planning for the construction of Varsity Village. Testimony of Monica Rimai [the University's Senior Vice President for Administration and Finance], Preliminary Injunction Hearing, Feb. 21, 2007 at 211 ("Rimai testimony"). The Varsity Village project includes a sports administration building, baseball diamonds, weight rooms, and other facilities for athletes. Testimony of Michael Thomas, Preliminary Injunction

Hearing, Feb. 21, 2007 at 49. The Village includes a building that is about eight stories tall. Miller Testimony at 152. The bottom level houses most of the locker rooms for all of the University's sports teams, the second floor houses the athletic training facility and several football-related meeting rooms, the third floor contains health services, and the remainder of the building contains administrative facilities. *Id.* A majority of the facilities are open to the general student population. Testimony of Robert Arkeilpane [the University's Deputy Director of Athletics], Preliminary Injunction Hearing, Feb. 23, 2007, at 314-15. For example, any student can go onto the football field and run, play touch football, or practice kicking. *Id.*

The Varsity Village was a $100,000,000.00 project and the original expectation was that about half of the cost would be raised privately. Thomas Testimony at 49. The project was not fully funded before a contract was let for the construction. *Id.* at 50. The Varsity Village opened in the Fall of 2006. Miller Testimony at 151. There is an amount of money still owed for the Varsity Village and fund raising for that project continues to this day. Rimai Testimony at 249. Since the Varisity Village has opened, the women's rowing team has had adequate erg facilities and weight lifting facilities. Miller Testimony at 146.

There is no dispute that the completed Varsity Village project did not include a boathouse for the women's rowing team, as a boathouse would have to be built on or near the water where the rowing team practices. The estimated cost of building a boathouse was between $2.7 and $4.3 million dollars. Thomas Testimony at 44. In 2001, Candace Kendle gave the University a $1 million gift for the purpose of building a boathouse. Arkeilpane Testimony at 366. In addition, there were two $300,000 pledges from private rowing teams in Cincinnati. Thomas Testimony at 44. Financing the cost of constructing a boathouse exclusively through private funding would not

3

add to the University's debt. Rimai Testimony at 244.

Bob Goin retired as the athletic director of the University on December 1, 2005, at which time Mr. Thomas became athletic director. He inherited an athletic department that was financially challenged in several directions. Deposition of Nancy Zimpher [President of the University], Vol. II (Jan. 29, 2007) at 62 (filed Feb. 7, 2007) (Doc. 39)("Zimpher Depo."). There were expenses tied to the construction of the Varsity Village, there were shortfalls in some of the donor projections for Varsity Village, and there were existing and continuing cost overruns of the budgets of various sports. *Id.* There was an accumulation of debt that Mr. Thomas encountered when he became athletic director and he has been charged by the University's financial people to get the budget under control. *Id.*

In February, 2006, James Plummer, the University's Executive Chief Financial Officer, and Miss Rimai recommended to the University's Board of Trustees that the University set aside $650,000 for the purchase of certain real estate on which to build a boathouse. Rimai Testimony at 245-46. The recommendation provided that the source of funding would be restricted and unrestricted gifts to the University. *Id.* at 246. The Board of Trustees approved the actions contained in the February, 2006, recommendation. Testimony of Marybeth McGrew [the University's architect and Associate Vice President of Campus Planning and Design], Feb. 23, 2007, Preliminary Injunction Hearing at 433.

In June, 2006, the University's budget planners projected a deficit of $27 million for the 2007, fiscal year. Rimai Testimony at 299-300. At that time, the boathouse project was still on the table and was not listed as a major project. *Id.* at 260. To address its projected budget deficit, the University made several budgetary cuts which impacted areas throughout the University. *Id.*

at 204. For example, the University has undergone a major reduction in force and, to date, has eliminated or laid off 105 positions, consolidated two major academic divisions into one, eliminated sections and courses, not hired new faculty members, and given less support to research. *Id.* With the exception of projects that were already in the ground, it has eliminated or put on hold capital projects including major buildings and major renovations projects. *Id.* at 204-05. The University is not engaging in any additional capital outlays for the foreseeable future. *Id.* at 205. The message from the President of the University was that all capital projects that were going to go forward had to be fully funded before a construction contract was let. Thomas Testimony at 48. That included construction of a boathouse. Rimai Testimony at 207.

During October, November, and December, 2006, and January, 2007, Ms. Rimai and Mr. Thomas had several discussions, including several about the athletic department budget. *Id.* at 261-62. With respect to the boathouse, they had a general discussion about the pressure that building a boathouse would create for the athletic budget as well as the general University budget in light of the fact that gift funding had not been secured. *Id.* at 262. Ms. Rimai advised Mr. Thomas that in order to start the boathouse project, a significant amount of the funding had to be in hand and there had to be a clear financing plan approved by the University. *Id.* at 263. Mr. Thomas was the decision maker with respect to the boathouse. *Id.* at 265. If Mr. Thomas had decided to put the boathouse project on the back burner and to "go out and beat the bushes" to raise the money to fund the project, Ms. Rimai would not have disagreed with that decision. *Id.* at 266. However, Mr. Thomas decided not to move forward with the boathouse. Thomas Testimony at 118. His decision was based on a number of factors that made it difficult to move in that direction including the fact that the money for the project was not in hand. *Id.* at 118-19.

Cutting a University program does not produce an immediate financial savings. Rimai at 212. For example, particularly with athletics, there are student athletes to whom the University has made promises of scholarships and the costs associated with those are not eliminated simply because the program is eliminated. *Id.* Some athletic programs like football and basketball bring in revenue which helps to pay for the cost associated with the venues in which they play. *Id.* If the revenue-producing programs are eliminated, the effect is to eliminate the revenue to service the debt. *Id.*

In October or early November, 2006, Mr. Thomas first discussed the status of the rowing team with President Zimpher and recommended discontinuing the rowing team and instituting a women's lacrosse team. Zimpher Depo. at 65. Subsequently but also in November, 2006, Mr. Thomas presented to her what she considered to be a thoughtful study about the financial demands of the women's rowing program and the programmatic issues related to that program. *Id*. at 57. The programmatic issues with respect to the rowing team included the difficulty with the boathouse project coming to fruition, the dangers inherent in women's rowing team members traveling off campus for practices, and the pipeline for the rowing team. *Id.* at 58. Essentially, Mr. Thomas recommended that the University discontinue the intercollegiate women's rowing team and institute a women's intercollegiate lacrosse team. *Id.* at 65-66. Relying on the study that Mr. Thomas gave to her, Ms. Zimpher concluded that the women's rowing program presented financial and program demands that the University could not meet. *Id.* At its November, 2006, meeting, Ms. Zimpher presented to the University's Board of Trustees the recommendation that the University discontinue the intercollegiate women's rowing team and institute a women's intercollegiate lacrosse team. *Id.* at 65, 67. The Board accepted the

recommendation. *Id.* at 99.

On November 28, 2006, which was about a week before semester examinations, at about 11:00 a.m., Mr. Thomas sent an e-mail to each of the members of the women's rowing team announcing a team meeting to be held at 3:30 p.m. that day. Arkeilpane Testimony at 337; Miller Testimony at 148, 150. At the meeting, Mr. Thomas announced that the University was cutting the rowing team after its Spring, 2007 season. *Id.* at 148. In addition, Mr. Thomas advised the team members that the University would grant releases so that team members could immediately pursue opportunities at any other university, that the University would honor commitments for financial aid at the same amount through a player's senior year, that team members would continue to have access to the athletic academic advising staff as well as academic support facilities through the senior year, and that team members would continue to receive the appropriate medical attention for injuries suffered as a result of rowing. Arkeilpane Testimony at 335-36.

For the July 1, 2005-June 30, 2006, NCAA reporting year, there were fifty-four (54) members of the University's intercollegiate women's rowing team. Testimony of Margaret McKinley [the University's Director of [NCAA] Compliance and Student Services], Feb. 23, 2007 Preliminary Injunction Hearing at 452. The majority of students who eventually row competitively matriculate without previous competitive rowing experience. Thomas Testimony at 59. The rowing team usually gets its members through try-outs, walk-ons, word-of-mouth, or through notice on the University's web site. *Id.* The University has the opportunity to recruit rowers at a number of places in and close to Ohio. *Id.* at 60. For example, one of the opportunities to recruit rowers is at the Midwest Scholastic Rowing Championship event that is

7

held in Cincinnati. *Id.* That championship event is a high school event in which over fifty teams participate. *Id.* Other recruiting opportunities include the Midwest Youth Club rowing events and the junior national championships. *Id.* at 61. There are rowing clubs throughout Ohio. *Id.* 61-62. An individual who rows for a rowing club which is at the high school level is not included in the National Federation of High Schools numbers because the NFHS numbers reflect only those participants who are on high school teams. *Id.* at 62. The general operating costs for the women's rowing program is between $200,000.00 and $300,000.00 annually. *Id.* at 101. All of the rowing team's practices and competitions are held off-campus. *Id.* at 83, 85. The University does not charge people to attend a women's rowing event. Plaintiff's Ex. BB.

There are about 25 players on a women's collegiate lacrosse team. McKinley Testimony at 453. Lacrosse is one of the fastest growing sports in America. Thomas Testimony at 96. There are far more high school women's lacrosse programs than high school rowing programs. Rimai Testimony at 288. The general operating costs for a lacrosse program would be between $100,000.00 and $200,000.00 annually. Thomas Testimony at 101. The women's lacrosse team will practice on campus on existing fields that are suited to playing lacrosse. Arkeilpane Testimony at 343. The women's lacrosse team will also have access to on-campus competitive venues. *Id.* at 343-44. The university will charge people to attend lacrosse games. Thomas Testimony at 95.

The University has a main campus and is also associated with Raymond Walters College and Clermont College. The University represents, and Plaintiffs do not dispute, that the Raymond Walters and Clermont Colleges are two-year colleges that offer associate degrees and certificate

8

programs. Students who complete the requirements for a two-year degree at either Raymond Walters or Clermont must then apply for admission to the University and must meet the regular, published admission requirements of the University.

In 2005, the University sought an opinion from the NCAA about whether students from those schools could participate in the University's athletic program. Declaration of Margaret McKinley, Mar. 26, 2007, filed Mar. 26, 2007 (Doc. 75, Ex. 1 thereto). The NCAA advised the University that because students at Raymond Walters and Clermont are not admitted to the University as regularly enrolled, degree-seeking students at the University, they are not eligible to participate in the University's athletic program. *Id.*

For the July 1, 2005, to June 30, 2006, U.S. Department of Education reporting period, the University had 16,098 full-time undergraduate students on its main campus. McKinley Testimony at 444; Defendant's Ex. 3. Of that number, 8,453 were men and 7,645 were women. *Id.* Stated differently, 52.5% of the student population was male and 47.5% was female. *Id.* at 447-48; Plaintiffs' Ex. BB. In addition, the unduplicated numbers of sports participants were 271 men and 208 women while the duplicated numbers were 286 men and 274 women. *Id.* at 444; Defendant's Ex. 3. The unduplicated number represents the "number of bodies" participating in sports; each student is counted only once regardless of the number of different sports she plays. *Id.* at 444-45. The duplicated number represents everyone who has participated. *Id.* at 444. That, is a multi-sport athlete is counted as a separate individual for each sport in which he or she participates. *Id.* Using the unduplicated number of participants, the total number for the 2005-2006 period was 479. *Id.*; Defendant's Ex. 3. Of that number 56.5% were male and 43.5% were female. *Id.* Considering the duplicated number of participants, the total number for the 2005-

9

2006 reporting period was 560. *Id.* at 446-47. Of that total number, 51.1% were male and 48.9% were female. *Id.*

Plaintiffs complain that the University's decision to terminate the women's rowing team violates the Equal Protection Clause and the "equal accommodation" prong of Title IX.

**II.     Standard of Review**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250, 106 S. Ct. 2505 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 106 S. Ct. 1348 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324, 106 S. Ct. 2548.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255, 106 S. Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

**III.    Analysis**

**A.    Equal Accommodation**

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). In 1979, the Department of Health, Education and Welfare (now the Department of Education) issued an interpretation of Title IX's application to college sports. *Title IX of the Education Amendments of 1972: a Policy Interpretation; Title IX and Intercollegiate Athletics,* 44 Fed. Reg. 71413 (Dec. 11, 1979). (Plaintiff's Ex. C) To be in compliance, an institution must do one of the following:

- provide women and men with proportionate participation opportunities at rates that are substantially proportionate to their respective rates of enrollment as full-time undergraduates (Prong 1); or

- demonstrate continuing program expansion for the under represented sex (Prong 2); or

- fully accommodate the athletic interests of the under represented sex (Prong 3).

These standards were promulgated pursuant to notice and comment rule-making. *Miami University Wrestling Club v. Miami University*, 302 F.3d 608, 612 (6th Cir. 2002).

Courts defer to the Department of Education's interpretations of Title IX. *McCormick ex rel. McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 288 (2d Cir. 2004) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 843-44 (1984). "The degree of deference is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX." *Id.* (citing *Cohen*, 991 F.2d at 895, *Neal v. Bd. of Trs. of the Cal. State Univs*., 198 F.3d 763, 770 (9th Cir.

1999) ; *Kelley v. Bd. of Trs*., 35 F.3d 265, 270 (7th Cir. 1994) and Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974)).

The University has been in compliance with the equal accommodation prong of Title IX and the termination of the rowing team does not place it out of compliance. As shown by the statistics quoted above, the opportunities for participation by women athletes (i.e. roster spots on women's teams) are more than proportional to the percentage of women in the undergraduate study body and have been consistently in each year after 2000.

Plaintiffs' argument depends on using the unduplicated count of athletes, that is, counting an athlete only once, regardless of how many different roster spots that athlete occupies on different teams. Plaintiffs offer no authority for using the unduplicated count and, to the contrary, the Department of Education prescribes the duplicated count. See 1996 Policy Clarification (Ex. D. to Plaintiffs' Memorandum in Support); *see also Cohen, supra*.

Plaintiffs assert that the University also incorrectly reports the number of male and female athletes by counting indoor track and field, outdoor track and field, and cross-country as separate sports. The Department of Education has established this format, however. Doc. 28-11, Pl. ex. E-4 "Track and Field, X-Country participants are broken out by each of the three sports.") The current Department of Education reporting of "All Track Combined," http://ope.ed.gov/athletics/InstDetail.asp, does not change that approach. Thus, it is proper for the University to count an athlete who competes on the cross-country team, indoor track team and outdoor track team as competing on three separate teams.

Plaintiffs' argument for non-compliance also depends on counting as undergraduates the students at the Clermont and Raymond Walters campuses; these students are not enrolled in the

13

University's baccalaureate programs and, per NCAA ruling, are not eligible to participate in intercollegiate athletics. The Department of Education has decided, moreover, that the purposes of Title IX, are best served if it "allow[s] each institution to use its customary definition of an undergraduate student as the basis for reporting the data required by the statute." 60 FR 61424, at 61428.  This Court finds nothing arbitrary or capricious in the Department of Education regulations.

Because the University is in compliance with the demands of Title IX, summary judgment will be awarded to Defendant on Plaintiffs' Title IX claim.

**B.** **Equal Protection**

The University asserts that Plaintiffs' § 1983 claim for violation of the Equal Protection Clause is barred by the Eleventh Amendment, citing *Dillion v. University Hospital*, 715 F. Supp. 1386-87 (S.D. Ohio 1989).  Plaintiffs do not address this claim in either their motion for summary judgment nor in their response to Defendant's motion.  Unless exceptional circumstances are present, issues that are not squarely presented to the trial court are considered waived.  *Jones v. Kimberly-Clark Corp.*, 2000 WL 1800475, *2 (6th Cir. 2000) (citing *Preferred Rx, Inc. v. American Prescription Plan, Inc.*, 46 F.3d 535, 549 (6th Cir. 1995)). Defendant's Motion for Summary Judgment will be granted on this claim.

**C.** **Retaliation**

Plaintiffs' Third Amended Complaint no longer lists retaliation as a claim.  However, since Defendant has moved for summary judgment on this claim prior to the filing of the Third Amended Complaint, the Court will only note it's absence and the absence of any evidence that the University's actions were motivated by exercise of Title IX rights.

D.	**Athletic Benefits**

Finally, the Court notes that Plaintiffs do not respond to Defendant's argument that all evidence shows that any claims of unequal facilities for the women's rowing team have been remedied by the University's recently opened Varsity Village, where the now non-varsity women's club rowing team enjoys access.  Wherefore, summary judgment will be entered on this claim as well.

IV.	**Conclusion**

Because the University has a higher percentage of female student athletes than the percentage of female undergraduates, Defendant's Motion for Summary Judgment, doc. 83, is **GRANTED**, and Plaintiffs' Motion for Summary Judgment, doc. 84, is **DENIED**. The instant case is **TERMINATED**, and the Clerk is **ORDERED** to remove it from the docket of the United States District Court, Western Division at Dayton.

**DONE** and **ORDERED** this Tuesday, January 22, 2008.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE